## E. I. DU PONT DE NEMOURS & CO. v. McCULLEN.

(Circuit Court of Appeals, Fourth Circuit.    April 29, 1919.)

No. 1654.

1. MASTER AND SERVANT ⊜264(4)—PLEADING AND PROOF.

A declaration charging employer's failure to keep its promise to provide additional electric lights, and failure to have its building in any other way sufficiently lighted, does not authorize admission of evidence regarding failure to furnish flash lights.

2. MASTER AND SERVANT ⊜265(9)—PERSONAL INJURY—BURDEN OF PROOF— SAFE PLACE TO WORK.

An injured servant, whose suit is based on employer's alleged failure to keep its promise to provide additional lights at a place hazardous under normal conditions, must show that it would have been safe and helpful to install them, especially where the making of the promise is denied.

3. MASTER AND SERVANT ⊜278(3)—PERSONAL INJURY—SUFFICIENCY OF EVIDENCE.

In a servant's personal injury action, based on alleged failure to comply with a promise to provide additional electric lights over dangerous troughs, frequently obscured by steam, evidence *held* insufficient to warrant recovery; it appearing that such lights would not have been of material benefit, and could not have been safely installed.

4. MASTER AND SERVANT ⊜258(11)—PERSONAL INJURY—PLEADING.

Allegations that defendant employer failed to have its building "in any other way sufficiently lighted," etc., *held* too vague and general.

5. TRIAL ⊜252(11)—INSTRUCTION—APPLICABILITY TO EVIDENCE.

In a servant's personal injury action, an instruction authorizing recovery if defendant employer could have supplied lights, other than those requested, which would not have been dangerous, and were necessary to make the place of work reasonably safe, *held* erroneous, because unsupported by proof.

Connor, District Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Virginia, at Richmond; Charles A. Woods, Judge.

Action by George L. McCullen against E. I. Du Pont de Nemours & Co.    Judgment for plaintiff, and defendant brings error.    Reversed.

J. Gordon Bohannan, of Petersburg, Va., and Robert H. Talley, of Richmond, Va., for plaintiff in error.

Bernard Mann and J. M. Townsend, both of Petersburg, Va., for defendant in error.

Before PRITCHARD and KNAPP, Circuit Judges, and CONNOR, District Judge.

KNAPP, Circuit Judge.    As a part of its extensive plant at Hopewell, Va., plaintiff in error, defendant below, operates what is known as "No. 4 Tub House," where cotton is boiled for use in the manufacture of certain products.    In this building were 10 rows of large tubs, each row having 13 tubs.    Cotton was brought in from the "nitrating house" through a trough partially filled with water.    Inside the building was a series of smaller troughs, provided with gates, by means of which the cotton and water were conveyed to the various

---

tubs. The employé in charge of this distribution was called a gateman. After the cotton had been properly boiled in the tubs, the water was drawn off through openings near the bottom into other troughs, by which it was taken out of the building. These troughs were about 18 inches wide and approximately 18 inches above the floor in front of the tubs. Above the troughs for carrying off the water was a platform extending all the way around the building, and from this platform there were steps leading down between the tubs to the floor level, on which the troughs and tubs rested. This arrangement permitted an employé serving the tubs to go from a tub on one side of a trough to a tub on the other side, or from a tub in one row to a tub in another row, without stepping across or jumping over a trough, which was dangerous and strictly forbidden. The space between the bottom of the steps and the side of the trough was some 3 or 4 feet. Each tub was fitted with a plug, driven in with a mallet, which was loosened by the use of a stick, when the water in a tub was to be changed, and thus the boiling water discharged into the trough. The tubs were emptied at frequent intervals, several tubs at a time, and whenever this occurred steam was formed in large quantities, like a dense fog, so that the tubs and troughs could scarcely, if at all, be seen even by a person close to them. The building was lighted with windows over the aisles on each side and with rows of arc lights, suspended from the ceiling, some 15 to 18 feet above the troughs.

McCullen began work for defendant in April, 1916, in the beater house. Two or three weeks later he was made gateman of No. 4 tub house, and continued in that service most of the time until the 18th of the following December, when he received the injuries for which he sues. His duties were mainly to attend the gates and regulate the flow of nitrated cotton and water into the various tubs, to insert plugs in the openings of the tubs when they were to be filled, and to remove the plugs when the tubs were to be emptied. In the 7 months and upwards before the accident he became expert in a kind of work which required no particular skill, and was of course perfectly familiar with the premises.

Coming, now, to the way he claims to have been injured, we quote his own testimony. After stating that he had occasion to go to tub No. 2 in the first aisle, to put in a plug, he says:

"I went down to No. 2 tub, down the steps. When I went down the steps, I had to turn to the right to fit my plug, and I walked along carefully, and I could not see anything, and I got a little too far, and I ran against that trough with my left leg, and then I fell and caught on each side of the trough with my hands, and my legs went in up to my knees in the hot water."

We have great difficulty in believing that plaintiff was hurt in the manner thus described. If, as he asserts, the steam was so dense that he could not see the trough, and so ran against it and was thrown from his balance, it is certainly remarkable that he happened to fall across it or over it in such a way that his hands grasped its invisible edges, some 18 inches apart, and still more remarkable that somehow his feet and legs up to the knees, and no other part of his body, got into the scalding water. In short, his account of the accident is far from con-

vincing, and the effort to visualize it or imagine it serves only to strengthen the impression of its improbability. But as the record shows that plaintiff, using a section of the trough for the purpose, made or attempted a demonstration of the occurrence in the presence of the jury, which they apparently accepted, and as it cannot perhaps be affirmed with certainty that what he says happened to him is physically impossible, we are not prepared to reverse the judgment on that ground, and turn therefore to other questions raised by the assignments of error.

The suit is based on alleged failure to provide plaintiff with a reasonably safe place in which to work. More specifically it is averred that he continued in a hazardous occupation in reliance upon a promise to remove or materially reduce the danger to which he was exposed, as will presently be explained. It is not claimed that the building and appliances therein used were in any respect improperly designed or constructed; nor is it a case where anything broke, or gave way, or got out of order. In a word, the hazard incurred by the plaintiff was a necessary condition or incident of the work in which he was engaged, as that work was originally planned to be carried on, and as it was in fact carried on, as respects this particular tub, up to the time of the accident. Moreover, there was no lack of proper rules, which employés were enjoined to observe for their own safety. In these rules plaintiff was fully instructed at the outset, and he understood them thoroughly. Indeed, he admits on cross-examination that "there was not much danger in working there, if you were particular, and kept from crossing the trough, and obeyed the rules." It will thus be seen that the case narrows down to and turns solely on the alleged promise to supply additional lights, and that contention will now be examined.

The testimony of plaintiff and his fellow workman, Page, is to the effect that they were talking together some 10 days or so before the accident, and came to the conclusion "that it was dangerous to continue doing work that way in that light"; that they "thought flash lights would be a big help to us"; that Page said he was going to ask for them, and plaintiff said, "Ask for me, too;" that accordingly he spoke to Saunders, the foreman, about flash lights and told him "that I thought it would help us"; that Saunders said he would take it up with the supervisor; that shortly afterwards he was informed by Saunders that "a row of lights would be put above the trough in a few days, that there was a contract"; and that he reported to plaintiff what Saunders had said. This is the promise on which plaintiff relies. Now, assuming that notice to this foreman was notice to defendant, which seems to us at least doubtful, it does not appear that Page, in talking with Saunders, made mention of plaintiff, or referred to him in any way, unless by the use of "us"—and there were a number of other employés in the building—and certainly said nothing which apprised Saunders that plaintiff was complaining of inability to see or asking for additional lights, much less that he had in mind to quit his job if such lights were not provided. In other words, there is at best but a shadow of proof that defendant is chargeable with knowledge of any request by plaintiff for more light, or that it ever made a promise in that regard of which he

can claim the benefit. Especially is this so in view of Saunders' denial that he made the alleged promise or had any authority to make it.

[1] We disregard the testimony relating to flash lights for several reasons. In the first place, we think it inadmissible under the pleadings. The sole negligence charged in the declaration is the failure of defendant "to comply with its said promise to provide rows of electric lights over said troughs," and its failure "to have said building in any other way sufficiently lighted." But this carries no suggestion that plaintiff should have been furnished with flash lights, which we suppose to be hand lights of some sort, in no way connected with any provision for properly lighting the building. In effect, therefore, the testimony brought in a new and distinct charge of negligence, which defendant had not been called upon to meet, and which it was apparently unprepared to meet; for the deposition of Saunders, the only person who could contradict Page, was taken in advance of the trial, because he had left defendant's employ and gone to another state, and naturally he was not interrogated at all on the subject of flash lights.

In the second place, it is not claimed that any promise was made to furnish flash lights. On the contrary, plaintiff understood from Page that flash lights would not be furnished, and manifestly he did not remain at work because he expected that lights of that kind would be provided. The gravamen of his cause of action is defendant's failure to keep a definite promise, namely, to place "rows of electric lights over said troughs," and his suit is not aided by the conceded refusal to do something entirely different. Moreover, there was no showing that the use of flash lights was either feasible or safe. The mere belief of plaintiff and Page that such lights "would be a big help to us" was not enough. This nitrated cotton, which was passing through the building in large volume, was quite harmless so long as it was kept wet, but highly inflammable and dangerous in a dry state. It was therefore incumbent upon plaintiff, if his declaration had so permitted, to prove not only that flash lights would have been of material benefit, but also that they could have been used with reasonable safety, and this he failed to do. In short, we are of opinion that the entire testimony in regard to flash lights should be left out of account.

[2, 3] This brings us to the question whether negligence can be predicated on the fact that defendant did not do what Page says the foreman promised; that is, put electric lights over the troughs. As above observed, this is not the ordinary case of work, or place to work, becoming more unsafe, and the employé's risk increased, because some appliance was defective or got out of order; it is rather the less frequent case of work, or place to work, of such inherent character as to involve a degree of hazard under normal conditions and with every appliance operating according to its design. In such case, we apprehend, the injured employé, whose suit depends on an alleged promise of betterment, must show that it would have been practicable and substantially useful to do what he claims was promised. Especially so where, as here, the making of the promise is denied, for surely in that case there can be no presumption of feasibility.

Plaintiff was, therefore, bound to give proof which would justify

the jury in finding that it would have been safe and helpful to place electric lights over the troughs, as he says he expected would be done; but careful study of the record satisfies us that no such proof was presented. It is true that a witness for defendant is reported as saying near the close of his cross-examination, "that if those lights had been dropped so that they were right over the trough, then anybody who came down the steps would have seen the lights before they got to the troughs." But this apparently had reference to the arc lights suspended from the ceiling, for the witness had previously said, also on cross-examination:

"That if they had had drop lights at intervals, * * * so that they would have come right down over the lower trough, they could not have seen this lower trough when the steam came on; that they might have seen the lights if you could have gotten right at the lights; * * * that while you are walking along the platform, with the 100-watt light shining up there, you could not see the light; * * * that a man standing on the platform could not see the 100-watt light right at him practically."

In short, so far from any showing that the lights here in question would have been efficient and usable, the testimony of this witness, taken as a whole, is of distinctly opposite import.

The situation we are dealing with is described by defendant's safety engineer as follows:

"That lights over trough would not have been effective in illuminating trough to a man standing beside it, as steam was too dense to be penetrable; could not see the trough; that the lights over this trough, which were put down after the accident, were removed, as they did not give the benefit anticipated; became impracticable because of the fumes arising from the hot water; steam and fumes combined eat out the wiring and made short circuits, making a greater hazard; that the cotton in the trough has all the explosive qualities of gun cotton; that if kept wet it will not burn, being unconfined, and if confined it will explode; that cotton sometimes gets dry, and a short circuit might cause a flash extending the entire distance of the house, if there were little particles of cotton on the tubs, and that even if it should strike a remote part of the building it would fire and explode. * * * That there is no practicable way of getting rid of the steam more than is done."

Of all this, as well as the testimony of other witnesses to the same effect, there is no attempt at contradiction and nothing to show that the facts were otherwise. Not only, therefore, has plaintiff failed to furnish the proof which we deem essential to his recovery under the circumstances here disclosed, but it seems to be convincingly established that such lights as he says were promised would not have been of material benefit and could not have been safely installed.

[4, 5] What has thus been said regarding defendant's alleged promise, on which plaintiff appears mainly to rely, applies with still greater force to his further charge of failure "to have said building in any other way sufficiently lighted." Taking into account the nature of his work and the conditions under which it was necessarily performed, we are clearly of opinion that he cannot maintain an action on any such vague and general allegation of negligence. Under his complaint that he was not provided with a reasonably safe place in which to work, the burden was upon him to show with some degree of definiteness and certainty

what the defendant could have done, safely and effectively, for the better lighting of the building; and so, as we think, it was error to charge the jury that plaintiff could not recover, "unless * * * or unless the defendant could have supplied lights other than those requested that would not have been dangerous, and that were necessary to make the place of work reasonably safe," for such a qualification but opened the door to conjecture and permitted a verdict wholly unsupported by proof.

On the record before us there is no evidence which would warrant the jury in charging the defendant with negligence, and it must therefore be held that plaintiff's injury was caused by his own carelessness, or resulted from risks which he voluntarily assumed.

Reversed.

PRITCHARD, Circuit Judge (concurring). While I heartily concur in the opinion of the majority of the court in this instance, nevertheless there is an additional reason why I think the judgment of the court below should be reversed. Under all the circumstances, I am clearly convinced that the accident could not, in human probability, have happened in the manner or under the circumstances as narrated by the plaintiff. The physical facts clearly indicate that plaintiff's injury was due to a failure to observe the rules of the company. The trough being 18 inches above the floor level, the plaintiff, by striking his foot against the side of the same, could not have fallen in as he states. It would have been a physical impossibility to have fallen in in the manner he describes. He was undoubtedly trying to cross the trough in utter defiance of the rules, and, making a miscalculation as to the distance to be covered, stepped inside with one foot, and, being bent on going in the direction he had started, he took another step, which necessitated putting the other foot in the trough. The burns on his legs clearly show that he must have been standing up in the trough and that his legs were not lying down at the time he was burned, as he contends. The character of the burns clearly indicates that this is the way the accident occurred.

CONNOR, District Judge (dissenting). I regret my inability to concur in the conclusion reached by the court in this case. No error is found in the instruction given by the learned judge who presided at the trial, respecting the measure of duty imposed upon the plaintiff in error to furnish the defendant in error a reasonably safe place in which to work. That the conditions under which he discharged the duty imposed upon him were hazardous is, I think, manifest. That such condition could have been remedied by lighting the place at which he was required to work is, I think, equally clear. The danger was apparent to the defendant in error, and, unless he called upon some employé, or agent, of the plaintiff in error, authorized, or held out and, upon reasonable ground, believed by the employé to be authorized, to receive notice and remedy such condition to furnish lights, he assumed the risk incident thereto. This rule, or principle of law, was clearly stated to the jury, and the duty imposed upon defendant in error to show

that he had complied therewith. No error is found in the instruction in this respect.

The testimony relied upon by defendant in error, and found by the jury to be true, is with the uniform accuracy of the learned Circuit Judge set out in the principal opinion. It was deemed by the judge presiding, sufficient to be submitted, and to sustain the conclusion of the jury. While not material, I am unable to concur in the opinion that this testimony was contradicted by Saunders, the foreman. Reference to his evidence discloses, at the best, an evasion of direct answers to the questions in regard to the request for lights.

While it must be conceded that the evidence is not so full and satisfactory as might be desired, I think that it was sufficient to be submitted to the jury, under the carefully guarded instruction of the trial judge. The jury had the benefit of hearing the evidence as illustrated by a model showing the conditions under which the defendant in error worked and of the tub into which he fell. While, as contended, sitting on the bench, it is difficult for us to understand how the accident occurred, as testified by the defendant in error, experience teaches that there are few incidents in life more difficult to explain after the event than a fall by a human being.

It is, for this reason among others, that such questions are submitted to the judgment of 12 intelligent jurors, whose opportunity for observation and experience is deemed of more value in reaching conclusions than those of appellate courts.